IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

WILLIAM C. CARN, III,      )
As Chapter 7 Trustee of SpecAlloy   )
Corp., *et al*.,          )
             )
    Plaintiffs,       )
             )
v.             )    CASE NO.  1:16-cv-703-TFM
             )          (WO)
HEESUNG PMTECH CORP.,     )
             )
    Defendant.       )

## OPINION and ORDER

## I.  INTRODUCTION

On December 22, 2017, William C. Carn, III, as the Chapter 7 Trustee ("the Trustee") of SpecAlloy Corporation doing business as Panhandle Converter Recycling ("SpecAlloy" or "the Debtor"), LKQ Corporation ("LKQ"), Converter Brokers, LLC, ("Converter Brokers"), and Enterprise Recycling, Ltd., doing business as Wrench-A-Part and Commodity Recyclers ("Enterprise") filed the Amended Complaint against Defendant Heesung PMTech Corporation ("Heesung" or "Defendant").[1]  The Trustee asserts claims of avoidable setoff pursuant to 11 U.S.C. §§ 553 and 550; avoidable preferences pursuant to 11 U.S.C. §§ 547 and 550; fraudulent transfers pursuant to 11 U.S.C. §§ 548 & 550; fraudulent transfers pursuant to the Uniform Fraudulent Transfer

---

[1] The Federal Rules of Civil Procedure do not provide for fictitious party practice as it is incompatible with federal procedure.  *See* Fed.R.Civ.P. 10(a) ("The title of the complaint must name all the parties. . . .").  Consequently, the sole defendant in this case is Heesung PMTech Corporation.

Act, Ala. Code §8-9-1, *et seq.*, and 11 U.S.C. §§ 544 and 550; re-characterization of the advances; and equitable subordination. LKQ, Converter Brokers, and Enterprise (collectively "the Suppliers") assert state law claims of conversion; breach of contract; quantum meruit; unjust enrichment; principal liability; and partner/joint venture liability. Doc. 24.

A case related to this matter is currently pending in the United States Bankruptcy Court for the Middle District of Alabama. *In re SpecAlloy*, No. 16-10013 (DHW). On November 28, 2016, Judge Dwight H. Williams, Jr., generally continued the matters in the bankruptcy proceeding pending the outcome of litigation in this court. *Id.*, Doc. 43-1.

On January 5, 2017, Heesung filed the Motion to Dismiss the Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6) and 12(b)(7). Doc. 28. On January 27, 2017, Plaintiffs filed a response to the Motion. Doc. 37. Heesung filed a reply to the Plaintiff's response on February 3, 2017. Doc. 38. The parties attached evidentiary materials to the aforementioned pleadings, motion, and responses. They also submitted additional evidentiary materials prior to the status conference on March 23, 2017. Docs. 43 & 44.

Generally, a court may not consider matters outside the complaint without converting a motion to dismiss to a motion for summary judgment. However, the court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed. In this context, "undisputed" means that the authenticity of the document is not challenged. *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d

1334, 1337 (11th Cir. 2010) (citing *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) and *Maxcess Inc. v. Lucent Techs, Inc.*, 433 F.3d 1337, 1340 (11th Cir. 2005)).

Heesung argues that its attached exhibits are "central to the claims asserted in the Amended Complaint." Doc. 37. Specifically, Heesung asserts that the documents are central to the claims because they "expressly contradict the limited 'factual' allegations contained in the Amended Complaint." *Id.* In addition, Heesung contends that this court may take judicial notice of the documents and evidentiary materials submitted in the bankruptcy case. Thus, this court must decide whether it is appropriate at this early stage of the proceedings to consider the attached evidence or whether it will consider the Motion solely by looking within the four corners of the Amended Complaint.

Despite the parties' multitude of attached evidentiary materials, this case is currently before the court on a motion to dismiss. As demonstrated by the sheer number of documents and the parties' extensive arguments over whether the facts as set forth in the Amended Complaint are a true representation of the circumstances in this case, it is clear that the parties aim to litigate factual questions beyond the scope of 12(b)(6). *Michel v. NYP Holdings, Inc*., 816 F.3d 686, 701 (11th Cir. 2016). While trial courts may consider matters outside the pleadings on conversion of a motion to dismiss into a motion for summary judgment, the court has near-absolute discretion to take such a procedural detour. *Jumbo v. Alabama State Univ*., 229 F. Supp. 3d 1266, 1270-71 (M.D. Ala. 2017) (citing 5C Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1366 (3d ed. 2016) ("[F]ederal courts have complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction

with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.")). The claims in this case are fraught with factual allegations. Therefore, the court will not convert the motion to dismiss into a motion for summary judgment. To the extent the parties have submitted documents in an effort to contradict factual allegations made by another party, the court will not consider the material at this early stage of the proceedings.

This court has federal question jurisdiction pursuant to 28 U.S.C. §1331, diversity jurisdiction pursuant to 28 U.S.C. §1332, bankruptcy jurisdiction pursuant to 28 U.S.C. §1334(b), and supplemental jurisdiction pursuant to 28 U.S.C. §1367. The parties have consented to a United States Magistrate Judge conducting all proceedings in this case and ordering the entry of final judgment pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1.

Now pending before the court is Defendant's Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 12(b)(7) filed by Heesung. Doc. 28. Upon consideration of the Motion, the Response, and the Reply, the court concludes that the Motion to Dismiss is due to be DENIED.


## II. STANDARD OF REVIEW

A Rule 12(b)(6) Motion tests the legal sufficiency of the complaint. Although it must accept well-pled facts as true, the court is not required to accept a plaintiff's legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is

inapplicable to legal conclusions."). In evaluating the sufficiency of a plaintiff's pleadings, the court must indulge reasonable inferences in plaintiff's favor, but we are not required to draw a plaintiff's inference. *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005). Similarly, "unwarranted deductions of fact" in a complaint are not admitted as true for the purpose of testing the sufficiency of plaintiff's allegations. *Id.*; *see also Iqbal*, 556 U.S. at 680, 129 S. Ct. at 1951 (stating conclusory allegations are "not entitled to be assumed true.")

A complaint may be dismissed if the facts as pled do not state a claim for relief that is plausible on its face. *See Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950 (explaining "only a complaint that states a plausible claim for relief survives a motion to dismiss"); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561-62, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (retiring the prior "unless it appears beyond doubt that the plaintiff can prove no set of facts" standard). In *Twombly*, the Supreme Court emphasized that a complaint requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Factual allegations in a complaint need not be detailed but "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (internal citations and emphasis omitted).

In *Iqbal*, the Supreme Court reiterated that although Fed. R. Civ. P. 8 does not require detailed factual allegations; it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949. A complaint must state a plausible claim for relief, and "[a] claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss. *Id.* The well-pled allegations must nudge the claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

## III. THE PLAINTIFFS' FACTS

The following factual allegations as presented in the Amended Complaint will be construed in the light most favorable to the plaintiffs, as the court must do at this stage of the proceedings. *See*, *e.g.*, *Financial Security Assur., Inc. v. Stephens, Inc.*, 450 F.3d 1257, 1262 (11th Cir. 2006). SpecAlloy, doing business as Panhandle Converter Recycling, is a company based in Dothan, Alabama. SpecAlloy sources or dismantles catalaytic converters it has purchased from other companies, such as LKQ, Enterprise Recycling, and Converter Brokers. SpecAlloy sells the components of the converters to buyers. Heesung was the primary buyer of materials, including precious metals sourced from the catalytic converters.

According to Plaintiffs, the relationship between SpecAlloy and Heesung changed in 2013. Prior to 2013, SpecAlloy sold materials to Heesung on a "cash-immediately-prior-to-shipment" basis. Pls' Amended Comp., p. 5. Beginning in 2013, SpecAlloy had insufficient working capital to continue its operations, source converters, and remain solvent. Thus, SpecAlloy required additional working capital in advance of purchasing the converters from companies such as LKQ, Enterprise Recycling, and Converter

Brokers. Heesung began transferring funds to SpecAlloy in advance of any shipments from the companies (the "advances"). The advances constituted SpecAlloy's primary source of working capital funding, other than a smaller credit account with Wells Fargo. The advances from Heesung provided SpecAlloy with more funding than was required to purchase converters, which additional funding (the "excess advances") was used to fund SpecAlloy's working capital, general operation costs, and for other purposes.

The advances were undocumented or very sparsely documented with no formal loan documents memorializing a revolving line of credit. Plaintiff alleges that Heesung gained control over SpecAlloy's financial and operational decisions in exchange for the funding provided through the advances. For the next two years, Heesung sent one or more of its employees or agents to represent its interests at SpecAlloy's facility on a regular basis. Heesung had access to SpecAlloy's customer invoices, purchasing plans, weekly projections, status reports, and other confidential business information. In addition, Heesung required SpecAlloy to provide it with detailed projections that included documentation related to the value of the converters and materials that SpecAlloy proposed to acquire, as well as other supporting documents, such as purchasing plans, weekly projections, and status reports related to the shipments to be sent to Heesung.

Plaintiffs also allege that the relationship between Heesung and SpecAlloy was extremely close and that Heesung made decisions with regard to SpecAlloy's funding that determined whether or not SpecAlloy would be able to pay its creditors and remain in business. Heesung directed SpecAlloy to arrange for the acquisition of converters for

its benefit. SpecAlloy took possession of converters from LKQ, Brokers, and Enterprise ("the Suppliers") and transferred them to Heesung. Thus, Heesung's position over SpecAlloy enabled Heesung to control the transfer of converters.

At some point in late 2015 or early 2016, SpecAlloy's financial performance was negatively impacted by falling commodity prices, poor decision-making, increased overhead, and other factors. In August 2015, consultants were hired to audit SpecAlloy's finances. The consultant's report indicated that SpecAlloy's financial position was worse than previously expected. The results of the audit were accessible to Heesung.

Between October and December 2015, Heesung began building a balance of cash and/or materials to set off against the amounts allegedly owing from SpecAlloy based on the excess advances. Heesung took certain materials from the facility and refused to pay invoices submitted by SpecAlloy. On or about December 11, 2015, Heesung seized certain materials, specifically pooled metals (the "seized pooled metals"), from SpecAlloy. Heesung did not pay for the seized pooled metals. According to SpecAlloy's schedules and statement of affairs filed in the bankruptcy case, the value of the seized pooled metals is $2,718,656.26. Pl's Amended Comp., citing SpecAlloy's Statement of Financial Affairs filed in the Bankruptcy Case at ¶6 (Doc. 59 at p. 40). In bankruptcy proceedings, Heesung claimed a setoff based on the seized pooled metals. SpecAlloy also alleged in its bankruptcy statement that Heesung took the seized pooled metals within 90 days of the petition date without permission because SpecAlloy allegedly owed a debt to Heesung. *Id*. On or around December 15, 2015, Heesung's attorney sent a letter to Joe Donovan, SpecAlloy's Chief Executive Officer, purporting to effectuate a

setoff of the excess advances against the amounts owed on the outstanding invoices (the "unpaid materials setoff").

As of December 15, 2015, SpecAlloy issued invoices to Heesung totaling $3,689,417.73. (the "outstanding invoices"). Heesung did not pay SpecAlloy for the materials on the outstanding invoices (the "unpaid materials"). Heesung took possession of the unpaid materials, including the catalytic converter components provided by the LKQ, Brokers, and Enterprise (the "supplier converters"), and shipped them to South Korea.

According to Plaintiffs, the value of the Supplier Converters was not less than $2,870,742.00.[2] SpecAlloy did not pay LKQ, Brokers, or Enterprise for the converters and advised Heesung on multiple occasions that title to the supplier converters never passed to SpecAlloy. Less than a month after Heesung seized the pooled metals and converter components and sent the setoff letter, SpecAlloy was forced to file for Chapter 11 bankruptcy protection. As of the petition date, SpecAlloy reported total liabilities of $19,246,158.51 and total assets of $8,693,807.38. On March 17, 2016, the bankruptcy case was converted to one under Chapter 7 of the Bankruptcy Code. The bankruptcy court appointed William C. Carn III as the Chapter 7 trustee of SpecAlloy's bankruptcy estate.

## IV. DISCUSSION

---

[2] Specifically, Plaintiff alleges the value of converters for LKQ is $1,637,000, for Enterprise is $875,742, and for Brokers is $358,000. Pl's Amended Comp., p. 10.

### A. The Trustee's Claims

Heesung asserts that all of the Chapter 7 Trustee's claims (Counts I-VI) are due to be dismissed because the Trustee fails to present sufficient factual allegations to establish a plausible claim for relief. Specifically, Heesung argues that the documents it provided to the Trustee in the bankruptcy case and its response to the Trustee's objection to Heesung's proof of claim "detail[] the various fallacies in the Trustee's assertions." Doc. 28, Motion to Dismiss, p. 13.

### 1. Count I: Avoidable Setoff under 11 U.S.C. §§ 550 & 553

The Trustee of SpecAlloy asserts that both the seized pooled metals setoff and the unpaid materials setoff are invalid and disallowed. Specifically, the Trustee contends that both setoffs by Heesung occurred within 90 days before the bankruptcy petition date while SpecAlloy was insolvent. In other words, the Trustee argues that Heesung's setoff rights may be affected by the bankruptcy code pursuant to 11 U.S.C. § 553(a)(3).

The Trustee asserts that it seeks to avoid the setoffs to the extent Heesung improved its setoff position between October 7, 2015 -- the ninety (90) days prior to the bankruptcy petition date -- and the dates of the setoffs pursuant to 11 U.S.C. § 553(b). In addition, the Trustee seeks to recover the value of the avoidable setoffs from Heesung pursuant to 11 U.S.C. § 550(a). Heesung, however, argues that the Section 553 claim is due to be dismissed because the allegations in the Amended Complaint are factually inaccurate.

An explanation of the law concerning Section 553 was recently summarized in

*Edward Specialties, Inc. v. Olive Props., Inc.* (*In re Edwards*), 553 B.R. 902 (Bankr. N.D.

Ala. 2016), as follows:

> Setoff under 11 U.S.C. § 553 "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A." *Citizens Bank of Md. v. Strumpf,* 516 U.S. 16, 18, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995) (quoting *Studley v. Boylston Nat. Bank,* 229 U.S. 523, 33 S.Ct. 806, 57 L.Ed. 1313 (1913)); *See also Dzikowski v. Northern Trust Bank of Florida, N.A. (In re Prudential of Florida Leasing, Inc.),* 478 F.3d 1291, 1297 (11th Cir.2007) (quoting *In re Patterson,* 967 F.2d 505, 508–09 (11th Cir.1992)) ("Setoff [under section 553] is an established creditor's right to cancel out mutual debts against one another in full or in part ... to avoid 'the absurdity of making A pay B when B owes A.'"). According to Black's Law Dictionary, setoff is defined as a "defendant's counterdemand against the plaintiff, arising out of a transaction independent of the plaintiff's claim." *Black's Law Dictionary* (10th ed. 2014).

> Although the Bankruptcy Code does not create a federal right of setoff, the right to setoff mutual debts is preserved by § 553 where it existed prepetition under applicable non-bankruptcy law. *Citizens Bank of Md. v. Strumpf,* 516 U.S. 16, 20, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995); *Brook v. Bank USA, N.A. (In re Acosta–Garriga),* 566 Fed.Appx. 787, 789 (11th Cir.2014); *In re Prudential of Florida Leasing, Inc.,* 478 F.3d 1291, 1297 (11th Cir.2007) (explaining that substantive law, usually state law, determines the validity of the right of setoff under the Bankruptcy Code).

> Section 553 of the Bankruptcy Code states as follows:

> > Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that—

> > > (1) the claim of such creditor against the debtor is disallowed;

> (2) such claim was transferred, by an entity other than the debtor, to such creditor—
>
>> (A) after the commencement of the case; or
>>
>> (B)　(i) after 90 days before the date of the filing of the petition;
>>
>>> (ii) while the debtor was insolvent ...; or
>
> (3) the debt owed to the debtor by such creditor was incurred by such creditor—
>
>> (A) after 90 days before the date of the filing of the petition; and
>>
>> (B) while the debtor was insolvent; and
>>
>> (C) for the purpose of obtaining a right of setoff against the debtor....

11 U.S.C. § 553(a).

The plain and unambiguous language of § 553(a) preserves any right of setoff a creditor "'may have under applicable nonbankruptcy law,' and 'imposes additional restrictions on a creditor seeking setoff' that must be met to impose a setoff against a debtor in bankruptcy.'" *In re Semcrude, L.P.,* 399 B.R. 388, 393 (Bankr.D.Del. 2009). Thus, a creditor must have both an independent right of setoff under applicable non-bankruptcy law, and further satisfy the additional requirements imposed under § 553(a). *In re McKay,* 420 B.R. 871, 877 (Bankr.M.D.Fla.2009).

In *Woodrum v. Ford Motor Credit Co. (In re Dillard Ford, Inc.),* 940 F.2d 1507, 1512 (11th Cir.1991), the Eleventh Circuit stated that § 553(a) imposes three requirements for setoff: (i) the debtor and creditor must owe each other mutual debts; (ii) the mutual debts must have arisen before the commencement of the case; and (iii) the setoff cannot fall within one of the three exceptions listed in § 553(a)(1)-(3).

553 B.R. at 909-910.

In this case, the Trustee alleges that Heesung incurred a debt to SpecAlloy within 90 days before the Petition Date while SpecAlloy was insolvent for the purpose of obtaining a right of set off against SpecAlloy. Specifically, the Trustee alleges that Heesung "[w]ithin 90 days before the Petition Date, Heesung created a debt from Heesung to SpecAlloy by (1) taking possession of the Unpaid Materials and refusing to pay the Outstanding Invoices, and (2) taking the Seized Pooled Metals without paying for them. Doc. 24, p. 13. According to the Trustee, "SpecAlloy was insolvent at the times that Heesung took possession of the Unpaid Materials, refused to pay the Outstanding Invoices, and took the Seized Pooled Metals without paying for them." *Id*. The Trustee further alleges that the value of SpecAlloy's assets and liabilities as of the bankruptcy petition date indicate its insolvency and therefore the seized pooled metals setoff and the unpaid materials setoff are invalid. In addition, the Trustee alleges that Heesung improved its purported setoff position between October 7, 2015, and the dates on which it purported to exercise the setoffs. *Id*.

Consequently, it is clear from the facts as alleged by Plaintiffs in the Amended Complaint that the Trustee has set forth an avoidable preference claim for relief which "nudge[s] it across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. This court therefore concludes that the Motion to Dismiss the Avoidable Setoff claims pursuant to Fed.R.Civ.P. 12(b)(6) is due to be denied.

### 2. <u>Count II: Preference Claims pursuant to 11 U.S.C. §§ 547 & 550</u>

The Trustee asserts avoidable preferences pursuant to 11 U.S.C. §§ 547 & 550. "Preference law under the Bankruptcy Code is aimed at insuring that all creditors receive an equal distribution from the available assets of the debtor." *In re Martin*, 184 B.R. 985, 990 (M.D. Ala. 1995) (citing H.R.Rep.No. 595, 95th Cong., 1st Sess. 177-78, reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 5963, 6138; 4 Collier on Bankruptcy ¶ 547.05 (1995)). Section 547(b) of the Bankruptcy Code, which applies to avoidable preferences, provides as follows:

> Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>
> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made—
>
>> (A) on or within 90 days before the date of filing the petition; or
>>
>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> (5) that enables such creditor to receive more than such creditor would receive if—
>
>> (A) the case were a case under Chapter 7 of this title;
>>
>> (B) the transfer had not been made; and

(C)     such creditor received payment of such debt to the extent provided by the provisions of this title.

Section 547(g) provides that a trustee has the burden of proving the avoidability of a transfer under 11 U.S.C. § 547(b) and that the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the non-avoidability of transfer pursuant to 11 U.S.C. § 547(c).

To avoid payments under § 547, the Trustee must establish that the Debtor was insolvent at the time the payments were made.  11 U.S.C. § 547(b)(3).  Heesung argues that the Trustee cannot maintain an action for avoidance of a preference because he does not include well-pled allegations of insolvency during the full year preceding the petition date.  Doc. 28, Motion to Dismiss, p. 21.

Section 547(b)(4)(A) allows for the avoidance of certain payments made "on or within 90 days before the date of the filing of the petition." Under Section 547(f), "the debtor is presumed to be insolvent on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f).  This presumption is rebuttable, but rebutting the presumption requires the presentation of evidence, which a court is not permitted to consider on a motion to dismiss.  *See In re Alpha Protective Servs.*, 531 B.R. 889, 898 (M.D. Ga. 2015), citing *Bank of Camilla v. St. Paul Mercury Ins. Co.*, 939 F.Supp.2d 1299, 1303 (M.D. Ga. 2013).  Therefore, to the extent the Trustee asserts that the debtor was insolvent for purposes of avoiding payments under section 547(b)(4)(A), the Trustee has adequately pled the element of insolvency for an ordinary preference claim at this stage of the proceedings.

The Trustee also seeks relief pursuant to 11 U.S.C. § 547(b)(4)(B), which allows for the avoidance of certain payments made "between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider." When seeking to avoid payments to an insider under § 547(b)(4)(B), a trustee does not enjoy the benefit of the § 547(f) presumption of insolvency because that provision only applies to transfers made during the ninety days immediately preceding the case filing. 11 U.S.C. § 547(f). Consequently, a trustee must plead sufficient factual allegations to establish insolvency during the insider preference period.

Even without the presumption, the Amended Complaint contains sufficient factual allegations to allow the Court to reasonably infer that SpecAlloy was insolvent during the insider preference period. The Trustee explicitly alleges throughout the Amended Complaint that the alleged preferential payments were made while SpecAlloy was insolvent. Defendant asserts that the Amended Complaint fails to "contain well-pled allegations of insolvency during the full year preceding the Petition Date" and "does nothing more than make conclusory statements and recite the law" which fails to satisfy Fed.R.Civ.P. 8(a). Doc. 28, p. 21. The court recognizes that the language in the Amended Complaint substantially mirrors § 547. Nonetheless, the question of whether SpecAlloy was insolvent at the time of the transfers is "a factual issue to be decided at trial or some other juncture." *In re Alpha Protective Servs., Inc.*, 531 B.R. at 902. Therefore, the court finds that the allegation that SpecAlloy was insolvent at the time of the transfers is a factual assertion rather than a bare recital or legal conclusion. *Id.*, citing *In re Haven Trust Bancorp, Inc.*, 461 B.R. 910, 913 (Bankr. N.D. Ga. 2011); *Howell v.*

*Fulford* (*In re Southern Homes and Ranch Supply, Inc.*), No. 11-12755, 2013 WL 7393247, at \*5 (Bankr. N.D. Ga. Dec. 20, 2013) (finding an allegation that a debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer was sufficient to plausibly state a claim of the debtor's insolvency).

Moreover, the Trustee has presented allegations of insolvency which nudge "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. The Trustee seeks to avoid a total of $10,292,634.46 in transfers made during the ninety-day period and $57,111,469.59 made during the one year prior to the petition date. This amount is significant, and it is reasonable to infer from the allegations that such payments being made to the alleged insider leading up to the petition date were made at a time when SpecAlloy was insolvent. "The Trustee does not have to prove each element at the pleading stage; he must only put forth enough factual allegations to raise a reasonable expectation that discovery will reveal evidence of his claim." *In re Alpha Protective Servs., Inc.*, *supra*. Accordingly, the court finds that the Trustee has plausibly pled the element of insolvency as to the § 547 insider preference claim.

Heesung also argues that the avoidable preference claim is due to be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) because the Trustee fails to identify with particularity the category of transfers it seeks to avoid or that he should be required to submit a more definite statement pursuant to Fed.R.Civ.P. 8. Doc. 28, p. 17. For example, Heesung argues that the Trustee should have listed the particular "Seized Pooled Metals" and "Unpaid Materials" from SpecAlloy. *Id.* In other words, Heesung argues that the Trustee failed to allege facts with particularity which specify whether the goods

transferred were "goods, payments, or cash." *Id*., fn. 35.  The Trustee alleges throughout the Amended Complaint the transfer of processed materials, such as the components of catalytic converters and pooled metals, as well as funds, which include cash flow, during the insider preference period.  "So 'long as the complaint makes clear who transferred what to whom and when, a preference defendant will have enough information to mount whatever defenses may be available."  *Tousa Homes, Inc. v. Palm Beach Newspapers, Inc.*, (*In re TOUSA, Inc.*), 442 B.R. 852, 856 (Bankr. S.D. Fla. 2010).  Thus, the Trustee's allegations regarding the category of transfers is sufficiently pled at this stage of the proceedings.

In addition, Heesung asserts that the claim is due to be dismissed because the Trustee fails to identify the antecedent debt owed by the Debtor to Heesung.  Def's Motion to Dismiss, p. 18.  The defendant cites *Mukamal v. Am. Express Co.*, (*In re Arrow Air, Inc.*), No. 10-28831-BKC-AJC, 2012 WL 6561313 (S.D. Fla. Dec. 14, 2012), as support for its argument that the avoidable preference claim should be dismissed.  The Complaint in the *Arrow Air* case, however, is substantially different because the plaintiff merely recited the language of the statute and "[did] not otherwise identify any facts which would allow the Court to make an inference regarding the existence of [the] antecedent debt to Defendant." 2012 WL at *4.  In this case, the Amended Complaint specifically states that the antecedent debt consists of the advances allegedly made by Heesung to SpecAlloy, to the extent the advances may be characterized as debt.  Doc. 24, Amended Complaint, p. 16.  Additional allegations regarding the advances are also set forth throughout the Amended Complaint and are summarized in documents attached to,

and referenced in, their pleadings. Doc. 24, Pl's Amended Comp., pp. 2, 5-9, 12, 15-16; Pl's Ex. C & D. This court finds that the Heesung's argument regarding the failure to plead the antecedent debt with specificity is unavailing at this stage of the proceedings.

Heesung further argues that dismissal is warranted because the factual allegations in the Amended Complaint do not sufficiently infer that Heesung was a statutory or "non-statutory" insider of the Debtor. *Id*., p. 18. Heesung contends that the Trustee's repeated assertions that it was an insider of the debtor at all relevant times are conclusory statements of fact and/or unsupported legal conclusions. *Id*., p. 19. Specifically, Heesung asserts that it is not a statutory insider because SpecAlloy lists it as a "non-insider" in its schedules and statements of financial affairs, which the Trustee relies upon in the Amended Complaint. In addition, Heesung argues that it is not a "non-statutory" insider because the Trustee's allegations that it had control over the debtor by providing funding is insufficient to render Heesung as an insider for purposes of extending the preference period under Section 547 of the Bankruptcy Code.

The District Court in *Scarver v. M. Abuhab Participacoes, S.A.* (*In re Moskowitz*), No. 10-73348, 2011 WL 6176210 (Bankr. N.D. Ga. Nov. 29, 2011), summarized the definition of "insider" as defined in 11 U.S.C. § 101(31) as follows:

The term 'insider' includes—

(A) if the debtor is an individual—

    (i)     relative of the debtor or of a general partner of the debtor;

    (ii)    partnership in which the debtor is a general partner;

    (iii)   general partner of the debtor; or

> (iv)   a corporation of which the debtor is a director, officer or
>         person in control....

[If there is no] dispute that [a party] does not fit any of the requirements for a statutory insider as it is not a relative of the Debtors, a general partner of the Debtors, a partnership in which the Debtors are general partners, or a corporation of which the Debtors are directors, officers or persons in control . . . the only way [the party] could be considered an insider is if it qualifies as a "non-statutory" insider.

Whether a party is an insider is a mixed question of fact and law. *In re Krehl,* 86 F.3d 737, 742 (7th Cir.1996). "Non-statutory insider status is a fact-intensive inquiry that must be determined on a case-by-case basis." *In re Spitko,* 2007 WL 1720242 at *9 (Bankr.E.D.Pa.2007). This "non-statutory" insider analysis begins with the use of the word "includes" in 11 U.S.C. § 101(31). Therefore, the type of entities that may be insiders is broader than the entities and relationships specifically identified in Section 101(31). The matter is left to the . . . court to determine who else may qualify as an insider. To determine whether a non-statutory insider relationship exists, the Eleventh Circuit considers two factors: the closeness of the relationship between the creditor and the debtor; and whether the transaction between the creditor and the debtor was conducted at arm's length. *Miami Police Relief & Pension Fund v. Tabas (In re The Fla. Fund of Coral Gables Ltd.),* 144 Fed. Appx. 72, 75 (11th Cir.2005). Both factors are required. . . . The applicable date for the analysis is the date of the transfer. . . . "[T]he definition of 'insider' as one with a close relationship to the debtor who receives more than what the insider would have received in an arm's length transaction includes those without knowledge that they are being preferred or without actual control over the debtor sufficient to cause the transaction to occur." *In re Healing Touch, Inc.,* 2005 WL 6488238 (Bankr.N.D.Ga.2005). This definition of non-statutory insider is consistent with the legislative history of Section 101(31). "An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor." H.R.REP. NO. 95–595 at 312 (1977).

Considerations important to determining the closeness of the relationship between the creditor and debtor include whether the parties maintained "frequent" contact; testimony that demonstrated a close relationship; whether the parties had a personal friendship; whether the creditor had the ability to coerce the debtor to enter into transactions not in the debtor's interest; whether the parties shared the same office space;

whether the creditor had actual control over the debtor; whether the parties were involved in a joint venture to share profits. *See, e.g., Shubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.),* 554 F.3d 382, 397 (3d Cir.2009); *Miami Police Relief & Pension Fund v. Tabas (In re The Fla. Fund of Coral Gables, Ltd.),* 144 Fed. Appx. 72 (11th Cir.2005) (the parties were friends for 30 years); *In re Krehl,* 86 F.3d 737, 743 (7th Cir.1996); *In re Holloway,* 955 F.2d 1008, 1012 (5th Cir.1992); *In re Friedman,* 126 B.R. 63, 69 (9th Cir.B.A.P.1991); *In re Tarricone, Inc.,* 286 B.R. 256, 259 (Bankr.S.D.N.Y.2002) (The parties "were introduced in 1981 ... and have dined and golfed together ever since, sometimes as often as once a week...."); *In re Emerson,* 235 B.R. 702, 707 (Bankr.D.N.H.1999) (debtor describing the creditor as a "good friend").

2011 WL 6176210, at *4-5.

The District Court further explained the law on non-statutory insiders as follows:

> Of course, for the Trustee to prevail on the argument that [a party] is a non-statutory insider, []he must prove both the closeness of the parties and that the transaction is not an arm's length transaction. In evaluating whether a transaction was conducted at arm's length, courts look to whether the loans were made on an unsecured basis and without inquiring into the debtor's ability to repay the loans; whether the creditor knew the debtor was insolvent at the time the debtor made the loans or recorded the security agreements; whether the loans were commercially motivated; whether the parties remained disinterested during the transaction; whether the parties were sensitive to "potential conflicts of interest"; whether the creditor was a "de facto director" of the debtor; whether the transferee had the ability to control or influence the debtor; whether the transaction only benefits one party; whether the loan made to the debtor was documented (e.g., promissory note, mortgage, and specified repayment terms); whether there were any strings attached as to how the debtor could use the loan proceeds; whether there is evidence of a desire to treat this creditor differently from all other general unsecured creditors. *See, e.g., Shubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.),* 554 F.3d 382, 399 (3d Cir.2009) (the creditor used a superior bargaining position to force the debtor to make a transaction); *Anstine v. Carl Zeiss Meditec AG (In re U.S. Medical, Inc.),* 531 F.3d 1272, 1281 (10th Cir. 2008); *Miami Police Relief & Pension Fund v. Tabas (In re The Fla. Fund of Coral Gables, Ltd.),* 144 Fed. Appx. 72, 75 (11th Cir. 2005); *In re Holloway,* 955 F.2d 1008, 1012 (5th Cir. 1992); *In re Emerson,* 235 B.R. 702, 707 (Bankr.D.N.H. 1999); *Freund v. Heath (In re McIver),* 177 B.R. 366, 370 (Bankr.N.D.Fla. 1995); *Rush v. Riddle (In re Standard Stores, Inc.),* 124 B.R. 318, 325 (Bankr.C.D.Cal. 1991).

*Id.*, at *5. Thus, the question of whether Heesung is an insider of SpecAlloy is primarily a question of fact to be decided at some point after the pleading stage. *See Alpha Protective Servs., Inc.*, *supra*.

The Trustee alleges that the relationship between Heesung and SpecAlloy was extremely close, that the advances constituted SpecAlloy's primary source of working capital funding, that Heesung gained control over SpecAlloy's financial and operational decisions in exchange for the advances, that Heesung had a position of control over SpecAlloy's acquisition of catalytic converters, and that one or more Heesung employees worked at the facility on a regular basis and had access to confidential business information, including the auditor's report of its financial position. Doc. 24, pp. 6-8. This court therefore concludes that the Trustee's allegation that Heesung was an insider is plausibly pled. Accordingly, the Motion to Dismiss the avoidable preference claims pursuant to Fed.R.Civ.P. 12(b)(6) is due to be denied.

### 3. Claims III & IV: Fraudulent Conveyance Claims

The Trustee seeks to avoid $146,474,169.49 in transfers of the unpaid materials, seized pooled metals, and other transfers of goods and cash during the two-year period as fraudulent pursuant to 11 U.S.C. § 548(a)(1). In addition, the Trustee seeks to avoid $199,364,363.32 in transfers of the unpaid materials, seized pooled metals, and all other goods and cash transferred during the four-year period as fraudulent pursuant to Alabama Code § 8-9A-4 and 8-9A-5 and 11 U.S.C. § 544.

Fraudulent transfers are defined in both the Bankruptcy Code and the Alabama Uniform Fraudulent Transfer Act. Fraudulent transfers are divided into two categories: (1) actual fraud; and (2) constructive fraud.

### a.   Actual Fraud

An actual fraudulent transfer is:

(1) A transfer by the debtor of an interest in property; and

(2) made with the actual intent to hinder, delay, or defraud creditors.

11 U.S.C. § 548(a)(1)(A); *see also* 11 U.S.C. § 544 and Ala. Code § 8-9A-4.

The Court in *Littleton v. Lanac Investments, LLC* (*In re Kudzu Marine, Inc.*), 569 B.R. 192 (Bankr. S.D. Ala. 2017), recently summarized the law on actual fraudulent transfers as follows:

> . . . "Actual fraud denotes the actual mental operations of intending to defeat or delay the rights of the creditor." [*In re*] *Vista Bella*[, *Inc.*, 511 B.R. 163,] 194 [(Bankr. S.D. Ala. 2014)]. The phrase "actual intent to hinder, delay, or defraud" is established by circumstantial evidence." *Vista Bella, Inc.*, 511 B.R. [at] 194 []. That evidence is established by certain "badges of fraud" as set out by the Eleventh Circuit in *In re XYZ Options, Inc.*, 154 F.3d 1262, 1271 (11th Cir. 1998). "No specific combination of badges is necessary for a finding of actual intent, and the presence of any of the badges of fraud does not compel such a finding." *Vista Bella* at 194. "The badges merely highlight circumstances that suggest that a transfer was made with fraudulent intent." *Id.* "With that being said, it is clear that actual intent to hinder, delay, or defraud is a heavily fact-dependent question and generally comes down to the credibility of witnesses." *Id.* at 193, 195. "Although part of the Alabama Code, [the badges of fraud] are appropriate to use to determine if there is a fraudulent transfer under federal law." *Id.* The badges are as follows:
>
> 1.      The transfer was to an insider;

2.  The debtor retained possession or control of the property transferred after the transfer;

3.  The transfer was disclosed or concealed;

4.  Before the transfer was made the debtor had been sued or threatened with suit;

5.  The transfer was of substantially all the debtor's assets;

6.  The debtor absconded;

7.  The debtor removed or concealed assets;

8.  The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;

9.  The debtor was insolvent or became insolvent shortly after the transfer was made;

10. The transfer occurred shortly before or shortly after a substantial debt was incurred; and

11. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id*. at 194.

569 B.R. at *203. The "badges of fraud" under the Bankruptcy Code are the same as those necessary to determine actual fraud under the Alabama Uniform Transfer Act. *Kudzu Marine*, 569 B.R. at *206.

In the Amended Complaint, the Trustee alleges that the transfers of goods or cash to Heesung during the two-year period prior to the petition date constitute actual fraudulent transfers. Specifically, the Trustee alleges that the transfers of the unpaid materials, the seized pooled metals, and other transfers of goods or cash to Heesung

during the two-year period totaling not less than $146,474,169.49 prior to the petition date constitute fraudulent transfers and listed a summary of the alleged transfers as an attachment.  See Doc. 24, Ex. E.  In addition, the Trustee states that Heesung was in a position to control the disposition of SpecAlloy's property, that SpecAlloy received less than the reasonably equivalent value for the two-year transfers, that it was insolvent at the time, or that to the extent it was not insolvent, the two-year transfers rendered it insolvent.  The Trustee also alleges that the property remaining after the two-year transfers was unreasonably small capital, that SpecAlloy intended to incur or believed it would incur debt that would be beyond its ability to pay, and that Heesung was an insider of SpecAlloy.

Upon reviewing the allegations set forth in the Amended Complaint, the court concludes that the Trustee has sufficiently alleged facts which set forth allegations of the badges of actual fraud.  This court therefore concludes that the Motion to Dismiss the actual fraudulent conveyance claim on the basis of Fed.R.Civ.P. 12(b)(6) is due to be denied.

### b.  Constructive Fraud

Section 548(a)(1)(B) provides that the trustee may avoid any transfer of an interest of the debtor in property, if the debtor voluntarily or involuntarily –

(a)     (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B); *see also* 11 U.S.C. § 544 and Ala. Code § 8-9A-5.

In other words,

"Constructively fraudulent transfers require not only a lack of reasonably equivalent value, but also, for the most part, that the transaction leave the debtor financially vulnerable. As a result, the trustee may not avoid a transaction simply because it was for less than a reasonably equivalent value. The debtor must also be in one of three fragile financial conditions: insolvency; possessing an unreasonably small capital; or believing that the debtor would incur debts beyond its ability to repay after the transaction. If a transaction leaves the debtor in any one of these conditions, and if the transaction was for less than a reasonably equivalent value, then fraud is presumed; no evidence of the debtor's intent is required." 5-548 Collier on Bankruptcy P 548.05.

*In re Kudzu Marine*, 569 B.R. at *206-07.

As previously discussed, the Trustee alleges SpecAlloy was insolvent, possessed small capital, and incurred debts beyond its ability to repay. The Trustee also alleges that the one-year, two-year, and four-year transfers were made with the intent to hinder, delay, or defraud its creditors, that Heesung's intent is imputed to SpecAlloy because

Heesung was in a position to control the disposition of its property, and that SpecAlloy received less than the reasonably equivalent value for the transfers. In addition, the Trustee alleges that the transfers to Heesung were made to an insider purportedly for an antecedent debt while SpecAlloy was insolvent and that Heesung had reasonable cause to believe of its insolvency.

The court therefore concludes that the Trustee has sufficiently alleged facts which set forth plausible constructive fraudulent transfer and avoidance claims pursuant to 11 U.S.C. § 548(a)(1)(B), 11 U.S.C. § 544 and Ala. Code § 8-9A-1, *et seq*. This court therefore concludes that the Motion to Dismiss the actual fraudulent conveyance claim on the basis of Fed.R.Civ.P. 12(b)(6) is due to be denied.

### 4. Claims V & VI: Recharacterization & Equitable Subordination

The Trustee asserts that this court should recharacterize Heesung's claim of advances as equity investments in SpecAlloy, rather than as loans. Alternatively, the Trustee asserts that equitable subordination is warranted pursuant to 11 U.S.C. § 510(c). Heesung argues that the Trustee fails to plead sufficient facts to support the claims for relief.

The recharacterization of an advance as an equitable contribution and the equitable subordination of a claim present different questions and serve different functions. *See Menotte v. NLC Holding Corp.*, (*In re First NLC Financial Servs., LLC*), 396 B.R. 562, 568 (Bankr. S.D. Fla. 2008). "'While a bankruptcy court's recharacterization decision rests on the *substance of the transaction* giving rise to the claimant's demand, its

equitable subordination decision rests on its assessment of the *creditor's behavior.*'" *Id.* (quoting *Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors*, (*In re Official Comm. of Unsecured Creditors for Dornier Aviation, Inc.*), 453 F.3d 225, 232 (4th Cir. 2006)). "Recharacterization analysis seeks to distinguish true debt from camouflaged equity." *First NLC Financial Servs.*, 396 B.R. at 568 (citing *Sender v. Bronze Group*, (*In re Hedged-Invs. Assocs., Inc.*) 380 F.3d 1292, 1298 (10th Cir. 2004)). "Recharacterization determinations 'turn on whether a debt actually exists, not on whether the claim should be equitably subordinated.'" *First NLC Financial Servs.*, 398 B.R. at 568 (quoting *Bayer Corp. v. MascoTech, Inc.* (*In re AutoStyle Plastics, Inc.*), 269 F.3d 726, 748 (6th Cir. 2001)). By contrast, when conducting an equitable subordination analysis, the court considers "'whether a legitimate creditor engaged in inequitable conduct, in which case the remedy is subordination of the creditor's claim to that of another creditor only to the extent necessary to offset the injury or damage suffered by the creditor in whose favor the equitable doctrine may be effective.'" *Id.*

### a. Recharacterization of Advances

"Recharacterization is appropriate where the circumstances show that a debt transaction was 'actually [an] equity contribution [] *ab initio.*'" [*AutoStyle Plastics*,] 269 F.3d at 747-48 (quoting *In re Cold Harbor Assocs., L.P.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997) (alterations in original)). The issue to be determined in recharacterization is whether a "transaction created a debt or equity relationship from the outset." *Cold Harbor*, 204 B.R. at 915; see also [*Cohen v. KB Mezzanine Fund II, LP, (In re*] *SubMicron Sys.* [*Corp.)*], 432 F.3d [448,] 454 [(3d Cir. 2006)] ('the focus of the recharacterization inquiry is whether 'a debt actually exists.'") (*quoting AutoStyle Plastics*, 269 F.3d at 748); *In re Hedged-Invs. Assocs., Inc.*, 380 F.3d at 1298 (applying multi-factor test "to distinguish true debt from camouflaged equity"). Recharacterization prevents an equity investor

from labeling its contribution as a loan, and subverting the Bankruptcy Code's critical priority system by guaranteeing itself a higher priority and a larger recovery – should the debtor file for bankruptcy. *Dornier Aviation*, 453 F.3d at 231. Thus, the "exercise of th[e] power to recharacterize is essential to the implementation of the Code's mandate that creditors have a higher priority in bankruptcy that those with an equity interest." *Id*. at 233.

*Menotte v. NLC Holding Corp.* (*In re First NLC Financial Services, LLC v. NLC Holding Corp.*), 415 B.R. 874, 879 (Bankr. S.D. Fla. 2009).

> When determining whether an advance should be treated as debt or equity, courts look to the actual manner, not the form, in which the parties intended to structure a specific advance. [*In re Hillsborough Holdings Corp.*, 176 B.R. 223, 248 (M.D. Fla. 1994) (citing *In re Lane*, 742 F.2d 1311, 1315 (11th Cir. 1984)]. "[A] court is not required to accept a party's characterization of an advance as a loan, but may recast the advance as a contribution to capital." [*Id*. (citing *Matter of Herby's Foods, Inc.*, 2 F.3d 128 (5th Cir. 1993))]. The Eleventh Circuit has identified numerous factors to consider when classifying an advance as a loan or equity contribution. *In re Lane*, 742 F.2d at 1314-15.

*Cary v. Vega*, (*In re Vega*), 503 B.R. 144, 151 (Bankr. M.D. Fla. 2013).

Under the multi-factor test for debt recharacterization, the court considers several factors including:

(1) the names given to the certificates evidencing the indebtedness;

(2) the presence or absence of a fixed maturity date;

(3) the source of payments;

(4) the right to enforce payment of principal and interest;

(5) participation in management flowing as a result;

(6) the status of the contribution in relation to regular corporate creditors;

(7) the intent of the parties;

(8) 'thin' or adequate capitalization;

(9) identity of interest between creditor and stockholder;

(10) source of interest payments;

(11) the ability of the corporation to obtain loans from outside lending institutions;

(12) the extent to which the advance was used to acquire capital assets; and

(13) the failure of the debtor to repay on the due date or to seek a postponement.

*In re Lane*, 742 F.2d at 1314–15. "None of the factors is dispositive and their significance may vary depending on the circumstances." *First NLC Financial Servs.*, 396 B.R. at 568 (quoting *Hedged Investments*, 380 F.3d at 1298-99.).

The defendants argue this case should be dismissed on the basis of evidentiary materials which they contend disprove the allegations set forth in the Amended Complaint. For example, they argue that "[t]he true nature of the Advance Payments is clear from the wealth of communications and documents shared between the parties and the contention that the Advances lack documentation is . . . belied by the documents and communications available to the Trustee. . . ." Doc. 28, p. 34. As previously discussed, this court will not consider the extensive evidentiary materials attached to the parties' pleadings or seek out documents submitted in another lawsuit at this early stage of the proceedings.

In the Amended Complaint, the Trustee alleges that multiple factors of recharacterization are present in this case. Specifically, Plaintiff alleges that there are no documents which specify that the advances were a loan from Heesung to SpecAlloy, that

there was no fixed maturity date or specific rights set forth for Heesung to enforce repayment, that the source of repayment was SpecAlloy's earnings, and that Heesung's participation in management at the SpecAlloy facility increased with the advances. Doc. 24, pp. 20-21. In addition, the Trustee alleges that Heesung did not seek interest payments on account of the advances, that SpecAlloy was thinly capitalized, and that it could not have obtained loans from outside lending institutions as extensive as the advances. *Id.*, p. 21. Assuming that "all allegations in the [Amended] Complaint are true (even if doubtful in fact)," *see Twombly*, 550 U.S. at 555, this court concludes that the facts as alleged in the Amended Complaint set forth a plausible recharacterization claim. *See Mukamal v. Bakes*, 383 B.R. 798, 829 (Bankr. S.D. Fla. 2007) (court found "plausible grounds to infer" recharacterization where plaintiff included "numerous allegations about Debtor's poor financial condition at the time of the . . . loan"). Thus, the Motion to Dismiss the recharacterization claim pursuant to Fed.R.Civ. 12(b)(6) is due to be denied.

### b. Equitable Subordination

Heesung asserts that the equitable subordination claim should be dismissed because the Trustee's allegations that Heesung was an insider or fiduciary of the debtor are unsupported and the Trustee fails to allege specific inequitable conduct.

Under 11 U.S.C. § 510(c), "after notice and a hearing, the court may (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed

interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim to be transferred to the estate." In the Eleventh Circuit, a court may equitably subordinate a claim only when the following three elements are established:

(1) The claimant must have engaged in some type of inequitable conduct,

(2) The misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, and

(3) Subordination of the claim must not be inconsistent with the Bankruptcy Code.

*Estes v. N & D Props., Inc*. (*In re N & D Props*.), 799 F.2d 726, 731 (11th Cir. 1986). "If the claimant is not an insider or fiduciary, however, the trustee must prove more egregious conduct such as fraud, spoliation or overreaching, and prove it with particularity." *Id*.

Heesung argues that it is not an insider and therefore the more egregious conduct for non-insiders must be pled. As previously discussed, the question of whether Heesung is an insider of SpecAlloy is primarily a question of fact which will not be decided at this early stage of the proceedings. *Cf. Baddour v. Participacoes S.A.* (*In re Moskowitz*), No. 10-73348-WLH, 2011 6176210, *14 (Bankr. N.D. Ga. Nov. 29, 2011) (court denied motion for summary judgment "[b]ecause a determination of subordination is intensely factual and material issues of fact remain[ed]").

The court concludes that the Trustee's allegations of Heesung's inequitable conduct as an insider nudge the claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. In Count VI of the Amended Complaint, the Trustee alleges that Heesung was an insider who controlled funding and disposition of its property and

used its position of control over SpecAlloy to its own benefit and to the detriment of other creditors. Doc. 24, p. 22. In addition, the Trustee alleges that Heesung did not deal with SpecAlloy in good faith and that it determined the amount of the excess advances by subtracting from its total advances the "value" of the products received from SpecAlloy based on its unilateral determination of that value. *Id*. Specifically, the Trustee alleges:

> After a consultant's audit revealed that SpecAlloy was having financial difficulties, Heesung moved quickly to position itself ahead of SpecAlloy's arms' length creditors by refusing to pay the Outstanding Invoices and by seizing assets such as the Unpaid Materials, Supplier Converters, and the Seized Pooled Metals. At the time Heesung seized those assets, it knew that SpecAlloy had not paid certain suppliers from which it had received possession of those assets. . . . Heesung engaged in inequitable conduct by seizing the Unpaid Materials, the Supplier Converters, and the Seized Pooled Metals with the intent of improving its position versus SpecAlloy's creditors. . . . Heesing's misconduct resulted in harm to SpecAlloy's other creditors and conferred an unfair advantage to Heesung because these actions drained SpecAlloy of assets that should have been available for distribution to creditors. Instead, Heesung took possession of those assets, moved them halfway across the world, and claimed an offset against a purported debt that amounted to payment in full to the extent of the offset. Thereafter, Heesung filed a claim in the Bankruptcy Case that would ostensibly enable Heesung to receive a further distribution on par with other creditors, lowering the distribution percentage for arm's length creditors.

*Id.*, pp. 22-23. Thus, the facts as pled state an inequitable subordination claim that is plausible on its face. *See Iqbal*, 556 U.S. at 679. This court therefore concludes that the Motion to Dismiss the inequitable subordination claim is due to be denied.

## B. The Suppliers' Claims

Heesung asserts that the state law claims filed by LKQ, Brokers, and Enterprise ("the Suppliers" or "Plaintiffs") should be dismissed because they fail to allege any

factual basis for their breach-of-contract or quasi-contractual claims. Specifically, Defendant contends that not one of the creditors can demonstrate that it contracted with Heesung or that it had the "sufficient promise and reliance to constitute a quasi-contractual claim." Doc. 28, Motion to Dismiss the Amended Complaint, p. 39.

### 1. Conversion

Heesung argues that the Suppliers fail to state a claim for conversion. Specifically, Defendant contends that Plaintiffs failed to allege sufficient facts indicating that they either owned or had the immediate right to possession of the catalytic converters taken by Heesung.

"Under Alabama law, conversion is a wrongful taking, or a wrongful detention, or an illegal assumption of ownership, or an illegal use or misuse of someone else's property." *Bell Aerospace Servs., Inc. v. U.S. Aero Servs., Inc.*, 690 F.Supp.2d 1267 (M.D. Ala. 2010) (citing *Webb v. Dickson*, 165 So. 2d 103, 105 (Ala. 1964)). *See also Ex parte Anderson*, 867 So. 2d 1125 (Ala. 2003). "At its core, conversion is 'the wrongful exercise of dominion over property in exclusion or defiance of a plaintiff's rights, where said plaintiff has general or special title to the property or the immediate right to possession.'" *Bell Aerospace Servs., Inc.*, *supra* (quoting *Ott v. Fox*, 362 So.2d 836, 839 (Ala. 1978)). In the Amended Complaint, Plaintiffs allege that LKQ, Brokers, and Enterprise held title to the catalytic converters supplied to SpecAlloy, that Heesung was aware that the converters were not SpecAlloy's property, and that Heesung wrongfully exerted dominion over the supplier converters. Plaintiffs also allege that Heesung took

possession of unpaid materials and shipped them to South Korea. Thus, the Suppliers' allegations that Heesung wrongfully took or assumed ownership of the catalytic converters states a plausible conversion claim. This court therefore concludes that the Motion to Dismiss the conversion claim pursuant to Fed.R.Civ.P. 12(b)(6) is due to be denied.

## 2. Breach of Contract

As an alternative to their conversion claim, the Suppliers assert a breach-of-contract claim against Heesung. Specifically, they argue that SpecAlloy contracted on behalf of Heesung with LKQ, Brokers, and Enterprise for the acquisition of converters.

First, Heesung contends that the state law claims for breach of contract, quantum meruit, and unjust enrichment (Counts VII, IX & X) are due to be dismissed on the basis of the Statute of Frauds, Ala. Code § 7-2-201. Specifically, Defendant argues that the plaintiffs fail to set forth any allegations indicating a written contract for the sale of the converters between the Suppliers and Heesung.

Alabama's Statute of Frauds, which is adopted from the Uniform Commercial Code, requires that any contract for the sale of goods over $500 should be in writing. Ala.Code § 7-2-201(1). There is no dispute that the catalytic converters are more than $500. The parties, however, dispute whether the writing requirement is applicable. The Suppliers assert that a written contract is unnecessary because Heesung partially performed the contract by receiving and accepting the catalytic converters. The partial-performance exception in Ala. Code § 7-2-201(3)(c) provides that a contract which does

not satisfy subsection (1) is valid and enforceable "with respect to goods for which payment has been made and accepted or which have been received and accepted (Section 7-2-606)." Heesung, however, argues that the partial-performance exception to the Statute of Frauds is inapplicable because any agreement for the sale of catalytic converters is between SpecAlloy and the Suppliers. In other words, Heesung contends that the exception only applies to goods accepted by the actual parties to the contract.

In the Amended Complaint, Plaintiffs allege that "Heesung agreed to purchase Converters and/or Materials from LKQ, Brokers, and Enterprise," that "Heesung received and accepted the Supplier Converters," and that "Heesung . . . failed to pay for the Supplier Converters." Doc. 24, p. 26. Plaintiffs, however, also allege that Heesung acted as an agent and entered into agreements on behalf of SpecAlloy. *Id*., p. 25. A finding of whether Heesung entered into an agreement with the Suppliers either as an insider or by direct negotiation or via SpecAlloy as its agent is in part based on a factual determination. Moreover, the specific reasons for Heesung's taking of the goods, such as for the purpose of exercising its right of set-off or as a wrongful seizure, are also based on fact intensive questions. The court, therefore, is unable to determine at this early stage of the proceedings whether the Statute of Frauds or the partial-performance exception is applicable.[3]

Heesung also argues that the breach of contract claim is due to be dismissed for the failure to state a claim because the existence of an express contract precludes an

---

[3] The court will entertain this issue at a later stage of the proceedings if this issue is raised by the parties at the appropriate time.

assertion that an implied agreement exists. The Suppliers, however, contend that that there is no written contract between the Suppliers and Heesung and that their agreement is implied. In the Amended Complaint, the plaintiffs allege that SpecAlloy acted as Heesung's agent to form contracts with them on Heesung's behalf and subject to its control and that Heesung failed to pay for the catalytic converters it agreed to purchase from the Suppliers.

> Under Alabama law, a plaintiff must establish the following to prevail on a breach of contract claim: "(1) the existence of a valid contract binding the parties in the action, (2) his own performance the contract, (3) the defendant's nonperformance, and (4) damages." *City of Gadsden v. Harbin*, 148 So.3d 690, 696 (Ala.2013) (internal quotation marks and citations omitted). Additionally, when an agent with real or apparent authority enters into a contract on behalf of a principal, the principal will be bound to the contract. *Lee v. YES of Russellville, Inc.*, 784 So.2d 1022, 1027 (Ala.2000). . . .

> Under Alabama law, "[t]he test for agency is whether the alleged principal has retained a right of control over the actions of the alleged agent." *Dickinson v. City of Huntsville*, 822 So.2d 411, 416 (Ala.2001). Establishing the right to control requires substantial evidence that the principal retained the right to direct the manner in which the agent conducted business. *Kennedy v. Western Sizzlin Corp.*, 857 So.2d 71, 77 (Ala.2003). "An agent's authority to contract on behalf of his principal must be either express, implied, or apparent." *Lawler Mobile Homes, Inc. v. Tarver*, 492 So.2d 297, 304 (Ala.1986). "[A]uthority can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him to act on the principal's behalf." *Treadwell Ford, Inc. v. Courtesy Auto Brokers, Inc.*, 426 So.2d 859, 861 (Ala.Ct.App.1983).

*Evans v. City of Talladega*, 136 F.Supp.3d 1354, 1362-63 (N.D. Ala. 2015).

A determination of (1) the entity who maintained control over the catalytic converters, (2) whether an implied contract existed between Heesung and the Suppliers,

and (3) whether SpecAlloy acted as an agent for Heesung are based on fact-intensive questions. This court concludes that the Suppliers' allegation that Heesung, acting through SpecAlloy as its agent, breached the terms of an implied contract with them nudges across the line from implausible to plausible. Consequently, the Motion to Dismiss the breach-of-contract claim pursuant to Fed.R.Civ.P. 12(b)(6) is due to be denied.

### 3. The Quasi-Contractual Claims

Heesung argues that both the quantum meruit and unjust enrichment claims fail to state a claim for relief because the goods in question are the subject of a written contract between two separate parties. Specifically, the defendant asserts that the quasi-contractual claims based on an implied contract are due to be dismissed because the proofs of claim filed in the bankruptcy court confirm an express contract for the purchase and sale of the Supplier Converters between the Creditor Plaintiffs and Debtor. Heesung, therefore, contends that the express contract supersedes the implied contract and therefore the quasi-contractual claims are inapplicable. The Suppliers, however, argue that Heesung is "misrepresenting the contents of the Proofs of Claims." Doc. 37, p. 45. As previously noted, this court will not parse through the voluminous attachments to the pleadings and motions in this case or review evidentiary material submitted in the separate bankruptcy proceeding to make any evidentiary findings at this early stage of the proceedings. The determination of whether an implied contract exists between the parties

is yet to be decided. Thus, the quasi-contractual claims will not be dismissed on this basis.

Heesung also argues that the Suppliers fail to sufficiently allege a quantum meruit claim because they fail to set forth specific facts demonstrating that they had a reasonable expectation of compensation for services. Specifically, Heesung contends that the plaintiffs fail to allege facts to support their conclusion that Heesung knowingly accepted the benefits of the catalytic converters and that they had a reasonable expectation of compensation for their services.

Quantum meruit is an equitable doctrine that is based on the theory of compensating one who confers a benefit on another in order to avoid unjust enrichment. *In re Performance Insulation, Inc.*, 2008 WL 4368673, *2 (S.D. Ala. Sept. 22, 2008) (citing *CIT Group/Equip. Fin., Inc. v. Roberts*, 885 So.2d 185, 189 (Ala.Civ.App. 2003)). Alabama courts require that in order to succeed on a claim of quantum meruit, a plaintiff must show that (1) he provided a benefit that was knowingly accepted, and (2) he had a reasonable expectation of being compensated for those services. *Mantiply v. Mantiply,* 951 So.2d 638, 656 (Ala.2006).

In this case, the delivery of goods, rather than the performance of services, is at issue. The failure to allege services or work provided, however, is not fatal to the plaintiffs' claim. In *Lee v. Town of Good Hope*, No. CV97-H-0227-NE, 1998 WL 465114, *14 n. 13 (N.D. Ala., Jun. 24, 1998), the court notes:

> Technically, a common law action to recover the value of goods provided or delivered is a "quantum valebant" action. See Black's Law Dictionary (6th ed. 1980). Quantum meruit refers to a common law action to recover

> compensation for work or labor performed. *Id.* Yet, both courts and legal commentators refer to "quantum meruit" as collectively embracing both work performed and valuable materials accepted. 98 C.J.S. Work & Labor §10 at 728 (1957).

This court therefore will consider the law applicable to both quantum valebant and quantum meruit actions.

In the Amended Complaint, the Suppliers allege that Heesung knowingly accepted the benefits of the converters, that they had a reasonable expectation that Heesung would compensate them for the converters, and that they had no reason to believe that Heesung would cease to pay for the converters or materials they acquired. These allegations are sufficient to set forth a plausible quantum valebant claim.

The Amended Complaint also asserts a separate claim for unjust enrichment. "Actions brought under the theory of unjust enrichment and quasi contract claims, such as quantum meruit, are essentially the same." *Lee*, 1998 WL 465114, at *14 (citing 42 C.J.S. *Implied Contracts* §5 at 7 (1991)). One is unjustly enriched if he "holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid to defendant because of mistake or fraud." *Avis Rent A Car Sys., Inc. v. Heilman*, 876 So.2d 1111, 1123 (Ala. 2003) (citations omitted). "Retention of a benefit is unjust if (1) the donor of the benefit . . . acted under a mistake of fact or in misreliance of a right or duty, or (2) the recipient of the benefit . . . engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship." *Carroll v. LJC Contracting, Inc.*, 24 So. 3d 448, 459 (Ala. Civ. App. 2009) (citations omitted). "In the absence of mistake or reliance by the donor, or wrongful conduct by the recipient, the

recipient may have been enriched, but he is not deemed to have been unjustly enriched."
*Carroll, supra* (quoting *Jordan v. Mitchell*, 705 So.2d 453, 458 (Ala. Civ. App. 1997),
*citing Restatement of Restitution: Quasi Contracts and Constructive Trusts* § 2 at 16)).

In the Amended Complaint, the Suppliers allege that Heesung knowingly accepted
and retained the converters and materials which it knew were supplied by LKQ, Brokers,
and Enterprise. The Suppliers assert both mistake and fraud. First, they allege that they
mistakenly believed that Heesung would pay for the converters based on the course of
dealing where Heesung advanced funds and paid for Converters sourced through
SpecAlloy and that they had a reasonable expectation of compensation. Secondly, they
allege that Heesung engaged in unconscionable conduct or fraud by using its unique
position of control over SpecAlloy to seize the converters and other materials and by
shipping the items overseas to Korea with the goal of enriching itself at the expense of
LKQ, Brokers, and Enterprise, while knowing that SpecAlloy was insolvent and unable
to pay its creditors.

It is clear that the Suppliers' allegations that Heesung seized or received valuable
catalytic converters which it knew belonged to LKQ, Brokers, and Enterprise and that the
Suppliers mistakenly believed through their course of dealing that they would be
compensated for those converters is enough to state a plausible claim for unjust
enrichment. Because the court concludes that the mistake-of-fact/misreliance prong is
sufficient to set forth a plausible claim of unjust enrichment, it is unnecessary for the
court to discuss the unconscionable conduct prong at this juncture. The court therefore

concludes that the Motion to Dismiss the quantum meruit and unjust enrichment claims pursuant to Fed.R.Civ.P. 12(b)(6) is due to be denied.

### 4. Principal-Agent or Partner-Joint Venture Liability

In Count XI of the Amended Complaint, the Suppliers assert that Heesung assumed *de facto* control over SpecAlloy, who had actual authority to acquire the converters for Heesung's benefit and therefore Heesung is liable as a principal for the obligations incurred by SpecAlloy. In other words, they argue that any vicarious liability of SpecAlloy is imparted to Heesung as its principal. Alternatively, in Count XII, the Suppliers assert that both Heesung and SpecAlloy had a joint property interest in and the right to mutually control their partnership or joint venture. They argue that Heesung is liable because SpecAlloy acted as Heesung's agent in the partnership when acquiring the converters from the suppliers.

First, Heesung asserts that Counts XI and XII should be dismissed because the Suppliers have failed to plead facts demonstrating an agency relationship between the debtor and Heesung. As previously discussed, the court concludes that the plaintiffs have sufficiently alleged agency for the purposes of Fed.R.Civ.P. 12(b)(6). *See Lee v. YES of Russellville, Inc.*, 784 So.2d 1022, 1028 (Ala. 2000) (determining whether agency existed was a factual question for the jury).

Heesung also argues that Count XII should be dismissed because the plaintiffs do not sufficiently allege the elements of a contractual relationship or joint venture. Specifically, Heesung contends that the plaintiffs fail to allege any facts indicating that

Heesung and SpecAlloy entered into a contract that created a separate, distinguishable corporate form or entity that would suggest that the parties intended to share profits and liabilities or establish a right of joint control.

> At [46 Am.Jur.2d, Joint Ventures,] s 7, a joint venture is described as follows:
>
>> 'There appears to be substantial agreement that in order to constitute a joint venture, the following factors must be present: a contribution by the parties of money, property, effort, knowledge, skill, or other assets to a common undertaking; a joint property interest in the subject matter of the venture and a right of mutual control or management of the enterprise; expectation of profits, or the presence of adventure; a right to participate in the profits; and, usually, a limitation of the objective to a single undertaking or ad hoc enterprise. No specific or formal agreement is required. Whether persons have entered into a joint venture depends largely upon the terms of the particular agreement, upon the construction which the parties have given it, as indicated by the manner in which they have acted under it, and upon the nature of the undertaking, as well as upon other facts.'

*McDuffie v. Hooper*, 294 Ala. 293, 296, 315 So. 2d 573, 576 (1975).

In the Amended Complaint, the plaintiffs allege that the initial debtor-creditor relationship between Heesung and SpecAlloy subsequently resulted in a de facto partnership between the companies wherein Heesung controlled SpecAlloy's expenditures and cash flow and their affairs became increasingly intertwined. They allege that SpecAlloy wrongfully purported to set off the cash or property of SpecAlloy's suppliers, including LKQ, Brokers, and Enterprise, against the amount it claims were owing from SpecAlloy. The plaintiffs also allege that Heesung employees or agents worked at the Dothan facility on a regular basis and Heesung required SpecAlloy to

provide it with detailed projections that included documentation related to the value of the Converters and Materials that SpecAlloy proposed to acquire as well as purchasing plans and status reports related to shipments. If plaintiffs were to have alleged only a traditional debtor-creditor relationship existed, it is arguable that joint-venture liability would be inapplicable to the facts of this case. *See Central Bank of Alabama, N.A. v. Gillespie*, 404 So.2d 35, 37 (Ala. 1981) (quoting 48 C.J.S. Joint Adventures § 1, pages 804 and 805 ("[I]f money which a person loans to another to be used in a business enterprise is to be repaid by the borrower, whether the venture proves a success or a failure, the contract is ordinarily construed to be one of lending and borrowing and not of joint venture, and the lender acquires no equitable interest in the property in which the money is invested, or liability to a third person for debts contracted by the borrower, even though under the agreement hje is to share in the profits of the enterprise.")). In the Amended Complaint, however, the plaintiffs' facts as alleged are sufficient to nudge the claims related to joint venture liability across the line from implausible to plausible at this stage of the proceedings. Consequently, the Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) is due to be denied.

### 5. The Joinder of a Party

Heesung asserts that all of the claims brought by the Suppliers are due to be dismissed pursuant to Fed.R.Civ.P. 12(b)(7). Specifically, Heesung contends that Plaintiffs failed to join SpecAlloy as a necessary party in this case pursuant to Fed.R.Civ.P. 19.

A party may move to dismiss a complaint under Rule 12(b)(7) if a required party cannot feasibly be joined in the action pursuant to Rule 19. Fed.R.Civ.P. 12(b)(7). First, the court must decide whether the absent party is "required" under Rule 19(a), which requires joinder of parties where feasible. Fed.R.Civ.P. 19(a); *Weeks v. Hous. Auth. of City of Opp, Ala.*, 292 F.R.D. 689, 691-92 (M.D. Ala. 2013). If the court determines that the party is "required" under Rule 19(a), but cannot be joined to the lawsuit, the court must decide whether "in equity and good conscience, the action should proceed among the existing parties or should be dismissed" under Fed.R.Civ.P. 19(b). *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1344 (11th Cir. 2011). The movant bears the initial burden of showing that the absent party is necessary for a just adjudication of the claims. *Weeks*, 292 F.R.D. at 692.

Fed.R.Civ.P. 19(a) provides, in pertinent part:

(1) *Required Party.* A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction must be joined as a party if:

    (A) in that person's absence, the court cannot accord complete relief among existing parties; or

    (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

        (i) as a practical matter impair or impede the person's ability to protect the interest; or

        (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

    (2)    *Joinder by Court Order*.  If a person has not been joined as required, the court must order that the person be made a party.  A person who refuses to join as a plaintiff may be made either a defendant or, in a proper case, an involuntary plaintiff. . . .

Once a person is found to be necessary for a just adjudication of the matter, if the person cannot be joined, Rule 19(b) requires that a court "determine whether in equity and good conscience the action should proceed among the existing parties or should be dismissed. . . ."

In this case, the Suppliers seek to recover from Heesung via state law claims of conversion and breach of contract, as well as under the theories of recovery of quantum meruit and unjust enrichment, and by asserting the concepts of both principal and partner/joint venture liability.  The court recognizes that the Amended Complaint is peppered with the Suppliers' alternating and sometimes inconsistent arguments that SpecAlloy was either controlled by, acted as an agent for, or acted in partnership with Heesung throughout the course of dealing.  Thus, it is arguable that SpecAlloy is a potential defendant in this action.  The argument that SpecAlloy is a "required" party, however, is more complicated.

In the Amended Complaint, the plaintiffs chose not to sue SpecAlloy, who is the debtor in the separate bankruptcy proceeding.  The Trustee of SpecAlloy, however, is a plaintiff in this case. In their Amended Complaint, Plaintiffs allege that the Trustee is empowered to liquidate and administer the debtor's assets, including to avoid and recover transfers and setoffs and to pursue causes of action for the benefit of its creditors.  Heesung argues that SpecAlloy, by itself, is a party to the contract with the Suppliers and

is therefore a "required" party. In other words, Heesung argues that the Suppliers did not contract with them and that any contracts at issue were between SpecAlloy and the Suppliers only. The Suppliers, however, allege that they did in fact have a direct agreement with Heesung and that SpecAlloy's involvement was merely as an agent or as a representative for Heesung. To the extent Heeung may have any defenses based on such an agreement, it is free to raise those arguments without SpecAlloy as a named individual defendant in this case. In addition, there does not appear to be a risk of double recovery because the bankruptcy court has stayed its proceedings until the resolution of this case. Thus, it is arguable that SpecAlloy's presence as a defendant in not "necessary" at this time. Nonetheless, the court recognizes that consolidating the cases in bankruptcy court where SpecAlloy is already a named defendant would be a more convenient and better use of judicial economy.

Even if the court were to presume that joinder of SpecAlloy as a required party was necessary, the court concludes that dismissal pursuant to Fed.R.Civ.P. 19(b) is unwarranted. It appears that any prejudice to the defendant could be lessened or avoided by protective provisions or other measures in the judgment. "[A] defendant who has filed a motion under Rule 12(b)(7) should contemplate ways to reach a compromise with the court and opposing counsel that continues the suit on terms more favorable to the defendant." Baicker-McKee, Janssen and Corr, Federal Civil Rules Handbook ("Baicker-McKee") Rule 19(b) at 609 (2017). In their Response, the plaintiffs proffer that "[i]f Heesung is truly concerned about a risk of inconsistent rulings, it could simply consent to have this entire matter heard in the Bankruptcy Court and consent to entry of a final order

by the bankruptcy judge" and that "Plaintiffs would be happy to stipulate to the transfer of this case to the Bankruptcy Court, and would have filed it in that forum had they not been concerned that Heesung would attempt to contest that court's jurisdiction."  Doc. 37, p. 53.  The defendant, however, is not enthusiastic about Plaintiffs' suggestion and would prefer this court to dismiss all of the Suppliers' claims because the debtor in the bankruptcy proceeding is not named as a party in this case.  This court cannot equitably and in good conscience dismiss the Suppliers' claims against Heesung on this basis. Thus, the Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(7) is due to be denied.[4]

# V.  CONCLUSION

Accordingly, it is

ORDERED that the Motion to Dismiss the Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6) and 12(b)(7) be and is hereby DENIED.

DONE this 27th day of September, 2017.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE

---

[4] The court suggests that counsel meet to determine the best manner to proceed in this case, including the most appropriate and efficient use of the court's resources and any protective provisions or other measures to ensure that any prejudice to the parties is lessened or avoided in the case before this court.